FILED
LODGED
ENTERED
RECEIVED

MAY 1 4 2026

AT BALTIMORE
CLERK U.S. DISTRICT COURT
BY DISTRICT OF MARYLAND
DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEIZURE OF
VIRTUAL CURRENCY STORED WITHIN,
OR ASSOCIATED WITH THE FOLLOWING
1 VIRTUAL CURRENCY ADDRESS:

TCQ6A79JKhYz3scHrHN97wezJDyFjwcPwK

Case No. 1:26-mj-00907-JMC
Case No. _____

### AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Andrew Jones, being duly sworn, depose and state:

### INTRODUCTION AND AGENT'S BACKGROUND

1.      I am "an investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in 18 U.S.C. § 2516.

2.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

3.      I am a Special Agent with the Criminal Investigation Division of the Internal Revenue Service ("IRS-CI") and have been since December 2022. As a Special Agent, my responsibilities include the investigation of criminal violations of the Internal Revenue Code, the Money Laundering Control Act, the Bank Secrecy Act, and related offenses. I earned a Bachelor of Science in Business Administration and Accounting in 2009 and a Master of Accounting in 2010 from The University of Tennessee at Knoxville.  I am a Certified Public Accountant, licensed in the state of Virginia.  Prior to IRS-CI, I worked as a full-time consultant and auditor at an

accounting and professional services firm for approximately five years and six months, and I was a Special Agent for the United States Secret Service for approximately three years and three months. I completed training at the National Criminal Investigation Training Academy at the Federal Law Enforcement Training Center in Glynco, Georgia, and at the U.S. Secret Service training facility in Beltsville, Maryland. I have been trained at the Federal Law Enforcement Training Center in the laws of search and seizure, and in the use of search and seizure warrants.

4.    I am currently assigned to the Cyber Crimes Unit in IRS-CI, and I have received training in cyber operations and in criminal schemes perpetrated via the internet. I hold certifications in the use of cryptocurrency blockchain analytics tools, including Chainalysis Reactor and Ethereum Investigations certifications. On June 18, 2024, I received a Global Information Assurance Certification in Information Security Fundamentals.

5.    This affidavit is made in support of an application for a warrant authorizing the seizure of the equivalent amount USDT as associated with the virtual currency address "TCQ6A79JKhYz3scHrHN97wezJDyFjwcPwK", herein referred to as the "**TARGET PROPERTY**", as proceeds of or involved in violations of 18 U.S.C. § 1343 (wire fraud) and 1956(a)(1)(B)(i) (money laundering), subject to criminal and civil forfeiture.

## APPLICABLE LAW

6.    This Court has jurisdiction to issue the requested warrants to seize property in the **TARGET PROPERTY** because it is proceeds of wire fraud, in violation of 18 U.S.C. § 1343, and/or involved in money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and as such is subject to criminal and civil forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(a) (criminal forfeiture), and 18 U.S.C. § 981(a)(1) (civil forfeiture).

7.    Title 18, United States Code, Section 1343 (wire fraud) provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice," shall be guilty of a federal offense.

8.    Title 18, United States Code, Section 1956(a)(1)(B)(i) (laundering of monetary instruments with intent to conceal) provides that "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" shall be guilty of a federal offense. Wire fraud is a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1).

9.    The proceeds of wire fraud are subject to forfeiture under both civil and criminal forfeiture authorities. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to civil forfeiture. In addition, 28 U.S.C. § 2461(c) provides that "if a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized," then the government can obtain a forfeiture of property "as part of the sentence in the criminal case." Thus, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to wire fraud is subject to criminal forfeiture.

10.   Property involved in a money laundering offense is subject to forfeiture under both civil and criminal forfeiture authorities.  Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to civil forfeiture.  In addition, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to criminal forfeiture.  Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime.  These forfeitures encompass all property "involved in" the crime, which includes the actual property laundered and property used to facilitate the laundering offense.  *See United States v. McKinney*, No. 07-0113-01 (RBW), 2009 WL 10701319 at *7 (D.D.C. Mar. 26, 2009) ("property that may be used to facilitate a money laundering violation includes money in financial accounts, personal property, real property, and businesses"); *see also United States v. Wyly,* 193 F.3d 289, 302 (5th Cir. 1999) (explaining that untainted funds that are comingled with tainted funds derived from illicit sources may constitute a facilitating property).

11.   This application seeks a seizure warrant under both civil and criminal authority because the property to be seized could otherwise be placed beyond the government's reach. Pursuant to 18 U.S.C. § 981(b), property subject to civil forfeiture may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement," if there is probable cause to believe that the property is subject to forfeiture. Pursuant to 28 U.S.C. § 1355(b), a forfeiture action may be brought in any district court where any of the acts giving rise to the forfeiture occurred, even as to property located in a foreign

jurisdiction. The criminal forfeiture statute, 18 U.S.C. § 982(b)(1), incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for a criminal forfeiture action. Section 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

## PROBABLE CAUSE

### Background on Relevant Cryptocurrency Entities and Concepts

#### Cryptocurrencies and Transaction Analysis

12.    Cryptocurrencies, also known as virtual currency, are not tied to any nation's fiat currency. The owner of cryptocurrency is assigned a mathematical encryption key pair, consisting of a "public key" and a "private key," with which to control the currency they own. The public key is also known as an "address," is visible to the public, and allows members of the public to verify the owner of virtual currency and other information. Addresses are also used to send and receive cryptocurrency. Wallets are software programs that interface with blockchains and generate and/or store the public addresses and private keys used to send and receive cryptocurrency. A "wallet" can hold multiple addresses for a user, and an "account" can hold multiple wallets for a user. Users can transfer cryptocurrency into a wallet and the cryptocurrency may be housed in any of the addresses within the wallet. The private key, also known as a "secret key," is essentially a password used to execute cryptocurrency transactions. Secret keys are typically only shared with the owner of the address.

13.    Cryptocurrency transactions can have multiple inputs and multiple outputs. While the ownership of any particular address or wallet can be anonymous, all transactions of cryptocurrencies are recorded on a "blockchain," which is a series of "blocks" of transactions that establishes a verifiable, transparent record of the movement of virtual currency. Blockchains in

this context are viewable by the public; they show all transactions, but do not reflect who owns a particular address. As cryptocurrency transactions are processed, they are assigned a unique identifier on the blockchain called a transaction hash.

14. Cryptocurrency exchanges exist and operate similarly to fiat currency exchanges. Customers use these exchanges to trade one form of digital currency for another, or to exchange digital currency into fiat money. In my training, knowledge, and experience, fraudsters will use cryptocurrency exchanges to launder or obfuscate their illicit gains.

15. Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, financial account information, including cryptocurrency wallets, is not typically shared across multiple, unrelated individuals. I also know that when information is shared, it is usually among a trusted group working in concert, or is in fact not shared at all, and merely the same subject accessing the information under different identities.

16. Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, I know that cryptocurrency can be laundered through multiple wallets and accounts in a manner that is similar to the laundering of fiat currency through different banks and bank accounts. However, with cryptocurrency the laundering transactions have the potential to be done in a faster and more efficient manner than through banking institutions. Fraudsters may attempt to obtain money from victims in the form of cryptocurrency because of its efficiency to be transferred from the United States and laundered through cryptocurrency accounts maintained by people and fraudsters outside of the United States.

17. Based on my training, knowledge obtained from FBI cryptocurrency experts, and experience, I know that individuals engaged in criminal activity involving cryptocurrency frequently engage in "chain hopping," meaning that they convert funds from one cryptocurrency

to another, in order to attempt to obscure the source of funds and make it more difficult to track illicit funds as they move from one blockchain to another.

Tether

18.     **Stablecoins**: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, Tether (USDT) is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

19.     **Tether (USDT):** USDT is a cryptocurrency that resides on multiple blockchains, including the Ethereum and Tron blockchains. USDT is issued by Tether International S.A. de C.V. ("Tether"), the company that manages the smart contracts and the treasury (*i.e.*, the funds held in reserve) for USDT. The value of USDT is tied to the value of the U.S. dollar; therefore, one unit of USDT is represented to be backed by one U.S. dollar in Tether's reserves, which classifies it as a stablecoin. In the instant case, at the request of law enforcement, Tether acted to freeze/blacklist the USDT associated with the **TARGET PROPERTY** and has indicated that they will continue to do so until they receive the instant warrant.

Bitcoin

20.     Bitcoin ("BTC") is a cryptocurrency hosted on the Bitcoin network, the first decentralized peer-to-peer payment network that is powered by its users with no central authority or middlemen. Transactions involving BTC are publicly recorded on the Bitcoin blockchain, which allows anyone to track the movement of BTC.

### Tron

21.    Tron is a decentralized blockchain designed to achieve high transaction volume with low transaction fees, commonly referred to as "gas" fees. The Tron blockchain is especially popular for users of stablecoins due to its speed and affordability. TRX is the native cryptocurrency of the Tron blockchain and is used to pay transaction fees, such as those generated when a user transfers USDT using the Tron blockchain.

### Bridges

22.    A bridge protocol, also known as a cross-chain bridge, is a software application that enables the direct transfer of virtual currencies across different blockchains (*e.g.*, from the Bitcoin blockchain to the Ethereum network). When a bridge protocol user initiates a transaction from one blockchain to another, the user specifies the number of coins or tokens that the user would like to send from the originating blockchain to the destination blockchain via the bridge.

23.    Some bridge protocols publish transactions using an "OP_RETURN" tag, which is a small amount of encoded data or text stored on the blockchain along with the transaction hash. These OP_RETURNs often contain the destination address of the virtual currency moved or exchanged via the bridge. The OP_RETURN and its corresponding "transaction hash" can be publicly viewed and analyzed on the blockchain.

### **The Investigation**

24.    IRS-CI is investigating what is known as a cryptocurrency "tech fraud scam" with multiple victims located throughout the United States.  "Tech fraud" scams take a variety of forms, but generally involve complaints from victims that state they received an email, text, or a "pop up" message on their home computer or cell phone that indicates their device has been "hacked", or that they are locked out of their financial account due to fraud.  They may also think

there is an unauthorized transaction on their credit card or bank account statement. The "pop up" message often is accompanied by a frozen screen and provides a notice to call "Microsoft", "Apple", or another widely known computer software company to resolve the issue. Common examples of the "pop up" messages received by victims resemble the following:

 

25.    Once victims contact "Microsoft", "Apple", or what they believe is their legitimate financial institution, they are passed through a series of imposters who purport to be affiliated with the aforementioned software companies, government institutions, and law enforcement entities. The imposters convince victims that not only are their home computing devices compromised, but their identities and personal information have also been stolen. The fraudsters then convince victims that they must move their assets out of their current financial institutions to other financial accounts in order to "safe-guard" their funds. The victims are led to believe that the accounts they are instructed to send funds to are set-up by the United States government and will be protected. In reality, the accounts to which victims are directed to send the funds are controlled by those involved in the fraud scheme and are often located overseas. Victims are also often directed to withdraw large sums of money from their financial institutions and open virtual currency accounts to send the funds to cryptocurrency wallets controlled by the fraudsters. Once again, victims are

led to believe that the virtual wallets they are directed to send money to will be used to "safe-guard" their funds, but in reality are controlled by the fraudsters.

26.    In August of 2025, IRS-CI began reviewing financial records and police reports of various elderly victims reporting fraud scams consistent with a "tech-fraud" scheme targeting the elderly. The first identified victim resides in Harford County, Maryland (herein referred to as "Victim 1"). A second identified victim resides in Avoyelles Parish, Louisiana (herein referred to as "Victim 2").

<u>Victim 1</u>

27.    According to a local law enforcement interview with Victim 1, as well as financial and other records, from approximately May 2025, through January 2026, Victim 1 was in contact with multiple individuals purporting to be official representatives from Apple, the IRS, PayPal and Truist Bank. Victim 1 spoke via phone with these purported official representatives on numerous occasions, where Victim 1 was told numerous false stories about her accounts at these various institutions being compromised, and outstanding taxes being owed by Victim 1. Eventually, the Fraudsters persuaded Victim 1 to send approximately $197,000 to Victim 2. This was completed via two separate wire transfers from Victim 1's Hartford Bank account to Victim 2's USAA bank account, as depicted in the below chart.

| Date | From | To | Amount |
|---|---|---|---|
| 04/25/2025 | Victim 1 | Victim 2 | $99,000 |
| 05/02/2025 | Victim 1 | Victim 2 | $98,000 |

Victim 2

28.     According to a November 18, 2025, law enforcement interview, in or around April 2025, Victim 2 received an alleged fraud alert on her phone, which appeared to be from USAA, Victim 2's bank.  Victim 2 initially spoke with a representative claiming to be from USAA, after which she was transferred to a "PayPal" representative by the name of "David", to resolve an alleged "foreign transaction issue."  To resolve the issue, David instructed Victim 2 to access a website that provided David with remote access into Victim 2's computer.  After accessing Victim 2's computer, David created a retail Coinbase account in the name of Victim 2 and connected Victim 2's bank account to the Coinbase account.  David then instructed Victim 2 to send approximately $535,000.00 from her bank accounts to the Coinbase account.  Once Victim 2's funds were in the Coinbase account, "David" or one of his co-conspirators initiated transfers from the Coinbase account to bitcoin addresses under the complete control of the fraudsters.  The funds sent to Coinbase were comprised of Victim 2's own funds as well as the above wire transfers from Victim 1 to Victim 2.  The wire transfers to Coinbase were completed via various transfers from Victim 2's bank account to Victim 2's Coinbase account, as depicted in the chart below:

| Approximate Date | Amount |
|---|---|
| 03/21/2025 | $39,500 |
| 03/24/2025 | $30,000 |
| 03/27/2025 | $89,500 |
| 03/31/2025 | $40,000 |
| 04/10/2025 | $140,000 |
| 04/25/2025 | $99,000 |
| 05/02/2025 | $97,000 |
| **Total to Coinbase** | **$535,000.00** |

29.    Investigators were able to trace the above deposits from Victim 2's Coinbase account through a series of subsequent external transfers and cryptocurrency conversions. This series of subsequent transactions began with seven transfers from the Coinbase account in Victim 2's name to the external BTC address bc1qpt6lcpltg85wm3ujm8ffevdg5adrj60hl2vm4l ("BTC Address 1") and ended with deposits into the **TARGET PROPERTY**.[1]

30.    The seven transactions initiated from Victim 2's Coinbase account, totaling approximately $519,877.74 (USD equivalent), that were sent to BTC Address 1 occurred as follows:

| Exchange | Date & Time | TX Hash | BTC Amount | USD Value (time of TX) |
|---|---|---|---|---|
| Coinbase | Mar 21, 2025 20:35:54 | 3b579....e87ec | 0.45643516 | $ 38,367.01 |
| Coinbase | Mar 24, 2025 17:04:28 | 59b5b…1b0b8 | 0.33070389 | $ 29,109.4 |
| Coinbase | Mar 27, 2025 15:57:02 | 0d11b…f842e | 0.99918793 | $ 86,956.21 |

---

[1] Your Affiant notes that the total amount of funds traced into the TARGET PROPERTY does not add up to the $535,000 transferred into and out of Victim 2's Coinbase account. In your Affiant's training and experience, this is common with the laundering of fraud proceeds, as funds are broken up into smaller uneven amounts and sent to various addresses, including addresses and exchanges that intentionally obfuscate further tracing or do not cooperate with legal process, preventing law enforcement from further tracing or seizing funds.

| Coinbase | Mar 31, 2025 23:39:59 | fbea7...4e50a | 0.47142382 | $ 38,874.17 |
|---|---|---|---|---|
| Coinbase | Apr 10, 2025 16:52:22 | fcd5a...6ca17 | 1.70998386 | $ 136,142.98 |
| Coinbase | Apr 25, 2025 20:23:32 | fd40b...c45e1 | 1.01115164 | $ 96,194.01 |
| Coinbase | May 02, 2025 17:28:47 | a6490...7578f | 0.96794076 | $ 94,233.96 |
| | | **Total** | **5.94682706** | **$ 519,877.74** |

31.     Thereafter, in six transactions from April 5, 2025, to May 2, 2025, approximately 5.159635 BTC (totaling approximately $ 454,628.70) was sent from BTC Address 1 to the BTC address bc1qlc2jk666j4xfpc2r9rhkjwqxjdvlsgn2923l6m ("BTC Address 2"):

| Date & Time | TX Hash | BTC Amount | USD Value (time of TX) |
|---|---|---|---|
| 4/5/2025 15:57 | 417de...cce68 | 0.000606 | $ 50.19 |
| 4/5/2025 16:13 | f18fa...1fa20 | 1.46998667 | $ 121,433.20 |
| 4/12/2025 22:14 | 7d6c2...03d84 | 0.00011706 | $ 10.00 |
| 4/13/2025 14:05 | 2c477...e3726 | 1.70985328 | $ 142,864.80 |
| 4/25/2025 23:25 | 78753...4a623 | 1.01114213 | $ 95,979.08 |
| 5/2/2025 17:57 | 547fa...1f0c7 | 0.967931 | $ 94,291.50 |
| | **Total** | **5.15963589** | **$ 454,628.70** |

32.     On May 27, 2025, 2.579237 BTC (totaling approximately $283,441.85) were sent from BTC Address 2 to the BTC address bc1q4g975yn33q0myahtwmvg4pkxd8hu6z57jrqh69 ("BTC Address 3").

33.     On June 28, 2025, approximately 2.578283 BTC (totaling approximately $276,677.47) was sent from BTC Address 3 to the BTC address bc1qpwd8dd93dlyzsars3jn4ykr457cp4pu7p5lae7 ("BTC Address 4").

34.     On July 14, 2025, 12 transactions totaling approximately 2.457327 BTC (totaling approximately $294,832.05) were sent from BTC Address 4 to BTC Addresses 7-16. In addition,

one transfer of 0.120839 BTC ($14,458.63 USD Equivalent) was sent directly from BTC Address

4 to Bridgers.xyz, a cross-chain bridging service used to facilitate cryptocurrency swaps.



35.    On the same day, BTC Addresses 7-16 transferred the majority of their received

BTC balances to cross-chain bridges and decentralized exchange services, including a total of

approximately 2.235518 BTC (totaling approximately $268,092.33) to "Bridgers.xyz".[2]

---

[2] The "Bridgers.xyz" cross-chain bridge publishes the destination or conversion address of BTC bridge transactions using the "OP_RETURN" tag. As previously described, the OP_RETURN function encodes a small amount of data or text with the transaction hash. The OP_RETURN and its corresponding transaction hash can be publicly viewed and analyzed using an open blockchain explorer.

36.    The BTC from Addresses 7-16 transferred to Bridgers.xyz is then converted into USDT and sent to Tron Addresses 1-11,[3] before then transferring the bridged USDT to the **TARGET PROPERTY** shortly thereafter:



37.    On October 16, 2025, Tether voluntarily agreed to freeze the **TARGET PROPERTY** after being provided with a transactional analysis tracing the fraud proceeds from

---

[3]

| Tron Address 1 | TFLawNkP3W94TD18ugbGoxHytz5X2bKa9v |
|---|---|
| Tron Address 2 | TGqWo1jR9c69suux9xxHgYwDRAx4MyWXm8 |
| Tron Address 3 | TXBqJt7GvuJryF9vDfGGTnE6DvUxnN8k1i |
| Tron Address 4 | TRuFnQjDSHsP9o7jEW8yhEALFZPpwN8yjv |
| Tron Address 5 | TUMdbqRpt7HV4tgz81ujPaj5BefnSQtrw1 |
| Tron Address 6 | TCcWpBqbz8SSi6occRdcGHXJbjr7tDuQTD |
| Tron Address 7 | TPNcoapA62wrKz9dsBgWXLAyKAABojMMo3 |
| Tron Address 8 | TSQR1GTLLRF7KXnnymdRZM78AW37tS7mp6 |
| Tron Address 9 | TNtHFPRMXoCCfMVveVjKZTJAd4byFyYTNt |
| Tron Address 10 | TEsgwN7Qzd1Gsy9khXg4eeAWZXFrZmGz9i |
| Tron Address 11 | TY1F3J9cX1LbUw8AmtmjTFcpVB78KbVibG |

Victim 1 and Victim 2. As of February 5, 2026, the **TARGET PROPERTY** had a balance of approximately 300,114.157375 USDT.

38.     Based on the specific tracing of USDT obtained fraudulently from Victims 1 and 2 to the **TARGET PROPERTY**, your Affiant respectfully submits that it is probable that the funds in the **TARGET PROPERTY** are proceeds of criminal activity. In your Affiant's training and experience, a cryptocurrency address used to in cryptocurrency fraud schemes similar to "tech fraud" is almost never also used for any legitimate purpose. For this reason, your Affiant believes the entire balance of the **TARGET PROPERTY** is comprised of funds obtained by fraud and subject to seizure. In addition, even if the source of some of the funds in the **TARGET PROPERTY** cannot be conclusively shown, because the **TARGET PROPERTY** contains illicit funds, your affiant respectfully submits that all funds in the **TARGET PROPERTY** are involved in money laundering, and therefore subject to seizure.

## CONCLUSION

39.     This affidavit seeks seizure of the equivalent amount of USDT tokens currently associated with the **TARGET PROPERTY**. Based on my training and experience, I know individuals engaged in fraud often move proceeds of criminal activity through multiple financial accounts, sometimes at a rapid pace, and often with no discernable legitimate purpose with the goal of concealing the true nature and source of the underlying funds. The blockchain analysis in this case demonstrates this; it shows the movement of the victims' funds, broken up and distributed through a series of transactions, without any apparent legitimate economic purpose, which implies the purpose of the transactions was to conceal the nature, source, location, ownership and control of the proceeds. See, e.g., *United States v. Rodriguez*, 53 F.3d 1439, 1447-48 (7th Cir. 1995)

(convoluted real estate transactions, from which intent to conceal or disguise may be inferred, also imply knowledge of illegal source).

40.     Based on the forgoing, I submit that there is probable cause to believe the funds held in the **TARGET PROPERTY**, in any form, are proceeds of, or traceable to proceeds of violations of, inter alia, 18 U.S.C. §1343 (Wire Fraud), and/or are involved in violations of 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering), and therefore subject to criminal and civil forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1).

41.     Further, because the requested warrants would be executed by serving electronically to Tether, I respectfully submit that there is good cause to permit the execution of the warrants at any time, day or night.

Andrew S.    Digitally signed by
Jones        Andrew S. Jones
             Date: 2026.04.13
             15:16:06 -04'00'

_____

Special Agent Andrew Jones
Internal Revenue Service – Criminal Investigation

        Affidavit submitted by email and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this _____14_____ day of April 2026.

_____

The Honorable J. Mark Coulson
United States Magistrate Judge

## ATTACHMENT A: PROPERTY TO BE SEIZED

Pursuant to this warrant, Tether International S.A. de C.V. ("Tether") shall provide the law enforcement officer/agency serving this document with the equivalent amount of USDT tokens that are currently associated with the virtual currency address referenced below *(i.e. 300,114.157375 USDT)*. Tether shall effectuate this process by (1) burning the USDT tokens currently associated with the virtual currency address[es] referenced below and (2) reissuing the equivalent value of USDT tokens to a U.S. law enforcement-controlled virtual currency wallet. Tether shall provide reasonable assistance in implementing the terms of this seizure warrant and take no unreasonable action to frustrate its implementation.

TCQ6A79JKhYz3scHrHN97wezJDyFjwcPwK